UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| IN RE: YASMIN AND YAZ ) <br> (DROSPIRENONE) MARKETING, SALES ) <br> PRACTICES AND PRODUCTS ) <br> LIABILITY LITIGATION ) <br> ) | 3:09-md-02100-DRH-PMF <br><br> MDL No. 2100 |

**This Document Relates To:**

*Karen Hubbard et al. v. Bayer HealthCare*           No. 3:14-cv-10017-DRH-PMF
*Pharmaceuticals Inc., et al.*,

**PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OF
DRS. BARNHART AND CROWTHER
REGARDING OPINIONS OF DEHYDRATION,
AND BRIEF IN SUPPORT**

Now come the Plaintiffs, by and through their undersigned attorneys, and move to exclude testimony and opinions of Defendants' experts, Dr. Kurt Barnhart and Dr. Mark Crowther, that dehydration increased the risk of Karen Hubbard's stroke. Plaintiffs in this Motion do not challenge any other opinions of these experts.

**I.      STATEMENT OF THE PROCEEDINGS**

All fact and expert discovery has been completed in this case. Defendants designated two case-specific experts: Dr. Kurt Barnhart, an OB-GYN, and Dr. Mark Crowther, an hematologist. Drs. Barnhart and Crowther have delivered generic causation reports in this MDL, and their qualifications in their respective areas of expertise are not challenged by Plaintiffs.

**II.     STATEMENT OF THE FACTS RELEVANT TO DEHYDRATION**

On October 30, 2012, Karen Hubbard suffered cerebral vein thromboses ("CVT") and subsequent intracerebral hemorrhage as a result, with devastating permanent disabilities. This is without dispute.

1

On the day of the stroke, Ms. Hubbard called her husband to come home. When he arrived, he found her unresponsive and called 911. Douglas County Emergency Medical Service responded and transported Mrs. Hubbard to Tanner Medical Center. Mr. Hubbard denied that Karen was dehydrated. (M. Hubbard depo., p. 187)

The Douglas County EMS records were produced and are attached. (Exh. 1 - Douglas County EMS) There is no reference in the record to dehydration. The ambulance personnel were not deposed.

At Tanner Medical Center in Villa Rica, Georgia, Karen Hubbard was diagnosed with "altered mental status" and "intracerebral hemorrhage," and then quickly transferred to Emory Medical Center. There is no writing or reference in the Tanner medical record that Karen Hubbard is dehydrated. (Exh. 2 - Tanner Medical Center records - 10/30/12)

Dr. Richard Warren is a board certified emergency medicine physician, practicing with the Tanner system for 14 years. (Warren depo., p. 43-44, 72) Dr. Warren conducted a physical examination of Karen Hubbard, noting that she moved spontaneously, her speech was generally confused, she did not recognize her husband, she had no evidence of trauma, her features were not sunken, and her skin was normal. (Warren depo., p. 48-50) He ordered a CT scan of the brain and "baseline labs to look at blood counts, to look at hydration status, to look at a drug screen." (Warren depo., p. 52) The CT scan showed blood on her brain, and he immediately decided to transfer Karen to Emory Medical Center. (Warren depo., p. 54, 72)

Based on his review of her lab results, Dr. Warren determined to a reasonable degree of medical certainty, she was not dehydrated - her $CO_2$ level was normal, there are no ketones in her urine, her BUN and creatinine (renal function) were normal, as was her glomular filtration rate (renal function). (Warren depo. p. 58-59, 74) The labs were drawn "right when she came through

the door" of the emergency room, before she received any IV fluids in the ER.  (Warren depo., p. 75)  The EMS records indicate that they placed the IV at 2:15 p.m., but did not administer any fluids to Karen Hubbard other than to flush the IV per protocol with 5 cc of normal saline solution.  (Warren depo., p. 81-82)  The lab results were not the result of rehydration by IV fluids.

Ms. Hubbard and her husband were on a medically supervised weight loss program at the time of her stroke and were successfully losing weight.  She and her husband were both seeing Dr. Bass at a weight loss clinic.  (M. Hubbard depo., p. 96)  Dr. Bass put them on a "consistent and regimented" approach to weight loss.  (M. Hubbard depo., p. 104)  They followed a 1,000 calorie per day diet, drank at least 64 ounces of water per day, and did cardiovascular exercise for 30 minutes per day.  (M. Hubbard depo., p. 104)  For their CV exercise, Mr. and Ms. Hubbard walked nature trails near their home, six days a week.  It was a "brisk walk;" Karen walked a 12 to13-minute mile, so he thinks they walked about three miles per hour.  (M. Hubbard depo., p. 106-7)  Their last visit to Dr. Bass was on October 29, 2012, and the doctor told Karen she was in great health.  (M. Hubbard depo., p. 108)

Dr. Bass prescribed phentermine as part of the weight loss program.  Plaintiffs retained Dr. Randall Tackett, pharmacologist.  Dr. Tackett opined that phentermine does not increase the risk of thrombosis.  (Exhibit 3 – Tackett Report). Dr. Tackett's testimony is the same as his report.  Dr. Barnhart also testified that phentermine is not a risk factor for cerebral venous thrombosis.  (Barnhart depo., p. 18). Dr. Crowther testified that phentermine is not directly related to the stroke.  (Crowther depo., p. 15).

Karen Hubbard had never been dehydrated before.  She and her husband were very health conscious.  (M. Hubbard depo., p. 98).  She was 41 years old, had no prior stroke, clotting or heart disease, and took only Beyaz birth control pills and phentermine at the time of the stroke.  She did

not ever smoke cigarettes, drank only occasionally and never took any illegal or street drugs. (M. Hubbard depo., p. 64, 76, 77, 82). She was normal and healthy.

The only reference to dehydration is in Mr. Hubbard's deposition when he denied that Karen was dehydrated when an EMT allegedly suggested Karen might be dehydrated and need fluids, and Mike replied that she drank at least 64 ounces of water a day. (M. Hubbard depo., p.187) According to the EMS record there is no dehydration noted and no fluids were administered. (Exhibit 1)

### III. DR. KURT BARNHART'S OPINION AND TESTIMONY ABOUT DEHYDRATION AS A CAUSE OF KAREN HUBBARD'S STROKE.

Dr. Barnhart, in his report dated 12/22/17, states only that "[t]he EMTs were concerned that she may have been dehydrated" (Barnhart report, p. 2), and "likely her dehydration in the days before her stroke" increased her risk of a thrombus. (Barnhart report, p. 5)

At his deposition, Dr. Barnhart testified that dehydration is "plausible." He won't say that she was or wasn't dehydrated; only that it is "a possibility in a realm of possibilities." (Barnhart depo., p. 26)

> Q: [Plaintiff] You would agree with me that you cannot say to a reasonable degree of medical certainty that Karen Hubbard was dehydrated on October 30th of 2012, correct?
> [Defendant]: Objection, asked and answered multiple times now.
> A: I don't know how to answer it differently. Again, I'm not trying to say she was or she wasn't. I'm saying that…given the circumstances, it's plausible she was, and if that's a possibility in the realm of possibilities -- you could go beyond that, a realm of plausibilities, then I would consider it as a risk factor for her event. (Barnhart depo., p. 26)

He cites three things to support his opinion that dehydration is plausible:

1) The EMTs suspected or reported that she was dehydrated. (Barnhart depo., p. 18)

2) A "mildly elevated white count, which is pretty nonspecific." (Barnhart depo., p. 19) Dehydration did not cause an elevated white blood count. "I don't know what the cause of the white count is." (Barnhart depo., p. 29)

4

3)  Karen Hubbard's weight loss and vigorous exercise.  (Barnhart depo., p. 19, 26)

## IV. DR. CROWTHER'S OPINION AND TESTIMONY ABOUT DEHYDRATION AS A CAUSE OF KAREN HUBBARD'S STROKE.

Dr. Crowther, in his report dated 12/22/17, stated that she was likely dehydrated at the time of her event.  He states that "dehydration causes an increase in the hematocrit and associated increased blood viscosity…, [and] it is likely than an increased hematocrit in an adult due to dehydration will be associated with an increase in the risk of venous thrombosis." (Crowther report, p. 3)

At his deposition, Dr. Crowther admitted that dehydration is not referenced in the EMT records, and he is relying on his recollection of Mr. Hubbard's testimony that Karen was dehydrated because of the degree of exercising and diet. (Crowther depo., p. 15, 45)  Specifically, Dr. Crowther testified about his recollection of the record:

> Q: [Plaintiff] …The facts that you rely upon to support your opinion that Karen Hubbard might be dehydrated are – is the testimony of her husband that you've told me about?
> A:  It's predominantly the testimony of her husband, plus the fact she was on a very restrictive diet, and I know from both personal experience but also from other patients who have been on restrictive diets, oftentimes your dietary intake is modified during the course of those.  And again, I can tell you, for example, we had a research nurse who was on one of those diets who came in with a very unusual chemistry problem, and it turned out because she got sick of the diet, she hadn't been adherent to it and became deficient in one of the vitamins.
> So I think these unusual diets are prone to cause trouble because patients are operating outside their usual sort of day-to-day dietary intake.  And I don't know what his diet was, but it strikes me, again, as someone who's used a lot of diets over the years, as pretty aggressive.

Dr. Crowther's opinions are based on three things:

1)  Mike Hubbard's alleged testimony that Karen Hubbard was dehydrated.  Dr. Crowther recalled that Mr. Hubbard "was worried that she was dehydrated based on the degree of exercising and the …diet." (Crowther depo., p. 45; also p. 15, 51, 55).

5

2)   A diet and failing to drink fluids. (Crowther depo., p. 45, 47, 55). He has no knowledge of the actual diet, and he admits that he is "sitting here speculating today as to what the actual diet was, other than it was a caloric restriction." (Crowther depo., p. 55).

3)   Vigorous exercise. Dr. Crowther said it was "noted in several places in the record…that she was exercising vigorously," but does not know what she was doing. (Crowther depo., p. 48). As noted above, he is recalling Mr. Hubbard's testimony about alleged vigorous exercise.

Dr. Crowther also explained his theory that Karen's dehydration would cause her hematocrit (blood viscosity) to increase, thereby leading to clots. When it was pointed out that Karen Hubbard's hematocrit levels were normal at Tanner and Emory on the date of her stroke, he said:

> Q: …Would these hematocrit levels give you any indication of whether she's in fact dehydrated?
> A: No, for the reasons we discussed earlier, particularly not Emory. By the time she got to Emory, she had had several hours of medical intervention and could easily have been rehydrated.
> Q: What about the hematocrit level at Tanner?
> A: Probably not, again for the reasons that we discussed, that, you know, she could have received fluids either through medical intervention or prior to coming into the hospital, which would have made her hematocrit move more towards normal.
> ….
> Q: Is there any way for us from the labs at Emory and Tanner to calculate what her hematocrit level was, say, 24 hours before she was admitted to Tanner?
> A: No, not that I'm aware. (Crowther depo., p. 53-54)

## ARGUMENT

### SUMMARY OF THE ARGUMENT

An expert opinion based on non-existent facts is not based on a reliable foundation and must be excluded. Drs. Barnhart and Crowther's opinions on dehydration are based on non-

existent testimony from Mike Hubbard, the EMTs and Dr. Richard Warren about dehydration, exercise and diet. The experts simply mis-remembered the testimony of these witnesses, and based their opinions on unfounded assumptions and poor recollections.

## I.     *DAUBERT* LEGAL STANDARD

The Seventh Circuit, as well as this Court, have frequently said that the legal standard for *Daubert* analysis is:

> Federal Rule of Evidence 702, and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), govern the admissibility of expert testimony. The *Daubert* standard applies to all expert testimony, whether based on scientific competence or other specialized or technical expertise. *Smith v. Ford Motor Co.*, 215 F. 3d 713, 719 (7th Cir. 2000) (citing *Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). Rule 702 provides:
>
>> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
>
> Fed.R.Evid. 702. *Daubert* clarified Rule 702 charges the district court with the task of ensuring expert testimony is both relevant and reliable. *Daubert*, 509 U.S. at 589.

*In re Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and Products Liability Litigation*, (Kerry Sims v. Bayer Corp.), 2011 WL 6732245 (S.D. Ill. 12/16/11) at * 2.

The Seventh Circuit courts follow a three-step analysis under *Daubert*. *Ervin v. Johnson & Johnson, Inc.,* 492 F.3d 901, 904 (7th Cir. 2007). First, the district court must determine whether the person offered is in fact an expert. In this case, Plaintiffs do not challenge the expert qualifications of Drs. Barnhart and Crowther.

Next, the court must evaluate the reliability of the methodology.

Secondly, the district court must determine the expert's reasoning or methodology is reliable. *Ervin,* 492 F.3d at 904; *see Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir.

7

2004) (citing *Kumho,* 526 U.S. at 147).  Specifically, the testimony must have a reliable basis in the knowledge and experience of the relevant discipline, *Kumho*, 526 U.S. at 149 (internal quotations removed), consisting in more than subjective belief or unsupported speculation.  *Chapman v. Maytag Corp.,* 297 F.3d 682, 687 (7th Cir. 2002); *Daubert,* 509 U.S. at 590.

*In re Yasmin and Yaz*, at *3.

The third and last step of the analysis is to "consider whether the proposed testimony will assist the trier of fact in its analysis of any issue relevant to the dispute." *Id.,* at *4.

### A.     Analysis of reliability:  Are there sufficient facts and data in the record?

Although the courts of the Seventh Circuit generally follow a rule that "[s]oundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact," *Smith v. Ford Motor Co.*, 215 F. 3d 713, 718 (7th Cir. 2000), the rule loses its dependability and reason when the expert goes off the rails and claims to rely on facts and data that are not supported by the record, and is still allowed to testify.

Plaintiffs contend that when there are no facts to support the expert's opinions, i.e., no factual foundation, the district court should not abdicate its gatekeeping responsibility by claiming that the factual basis is a matter for the trier of fact.  To be reliable, the expert's opinions must be based on facts, albeit disputed facts, that are in the record.  However, if the expert bases his opinions on non-existent facts, his opinions do not meet the reliability standards of Federal Rules of Evidence 702 and *Daubert* and its progeny, and should be excluded as based on speculation and an unreliable foundation

The Supreme Court, in *Daubert* stated that "the Rules of Evidence…assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand," 509 U.S. at 597.  "Expert evidence can be both powerful and quite

8

misleading because of the difficulty in evaluating it." *Id.* at 595, citing Weinstein, *Rule 702 of the Federal Rules of Evidence Is Sound; It Should Not Be Amended,* 138 F.R.D. 631, 632 (1991). Therefore, "under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589.

In *General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), the Supreme Court analyzed the factual predicate of the expert opinion, and found that the animal "studies were so dissimilar to the facts presented in this litigation that it was not an abuse of discretion for the District Court to have rejected the expert's reliance on them." 522 U.S. at 144-45. Similarly, the Court reviewed four epidemiological studies relied upon by the expert and found that they were also dissimilar to the facts, and excluded the opinions on which the studies were based as having an unreliable foundation. Id. at 146-47.

Further, in *Kumho Tire Co., Ltd v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)*,* the Supreme Court stated that "where [an expert's] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question….the trial judge must determine whether this testimony has a reliable basis in the knowledge and experience of [the relevant] discipline." 526 U.S. at 149. The Supreme Court then reversed the Eleventh Circuit Court opinion that rejected the trial court's exclusion of factually unfounded expert testimony, noting that the tire expert's opinion of the lack of abuse to the tire was unreliable given "evidence of the presence of the very signs [of abuse] for which he looked (and two punctures)." Id. at 154.

It is the responsibility of the district court to examine the reliability of the foundation of the expert's conclusions, and if it finds the foundation non-existent, the district court must exercise its authority to exclude that part of the expert's opinions. This Court has done this in *Cunningham Charter Corp. v. Learjet, Inc.* 2011 WL 1549214, 85 Fed.R.Evid.Serv. 223 (S.D. Ill. 2011). In

9

*Cunningham*, up for consideration was whether the plaintiff's expert could testify about his calculation of damages caused by the alleged breach of warranty on the sale of an aircraft, and this Court refused to allow the expert to testify, finding that the expert "did not base his analysis on sufficient facts or data." *Id.* at *5. This Court found that there were gaps in the data relied upon by the expert and the opinions were the product of "assumptions and personal speculations", and therefore the opinions were based on "speculating and *ipse dixit* conclusions" and excluded the expert's opinions.

The Fourth Circuit, in *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994), held that "[a]n expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record." In *Tyger Construction*, the evidence was undisputed that a sand stockpile existed during the time covered by the expert's calculation for damages on the basis that there was no sand available. The Fourth Circuit reversed the trial court's decision to allow the expert to testify because

> the trial judge's belief…that the question of whether an expert's opinion had an adequate basis in fact should be handled by opposing counsel through cross examination and in jury argument. The court may not abdicate its responsibility to ensure that only properly admitted evidence is considered by the jury. Expert opinion evidence based on assumptions not supported by the record should be excluded.

*Id.* at 143.

The Third Circuit in *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3rd Cir. 2012), and *Heller v. Shaw Indust., Inc.*, 167 F. 3d 146, 153 (3rd Cir. 1999), has held that "'while [t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate,' *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786, a district court must examine the expert's conclusions in order to determine whether they could reliably follow from the facts known to the

expert and the methodology used." Id. at 294.  The Third Circuit decisions are premised on Federal Rule of Evidence 702 and the *Daubert* trilogy:

> Where proffered expert testimony's 'factual basis, data, principles, methods, or their application are called sufficiently into question, ... the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of the relevant discipline.' " *Kumho,* 526 U.S. at 149 (quoting *Daubert,* 509 U.S. at 592). A district court's inquiry under Rule 702 is "a flexible one" and must be guided by the facts of the case. *Daubert,* 509 U.S. at 591.

Id.  See also, *Ruggiero v. Warner-Lambert Co.,* 424 F.3d 249, 255 (2d. Cir. 2005) ("when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."); *Meadows v. Anchor Longwall & Rebuild, Inc.,* 306 F. App'x 781, 790 (3rd Cir. 2009) ("expert testimony based on assumptions lacking factual foundation in the record is properly excluded").

**II.     Dr. Barnhart's Opinion About Dehydration Should Be Excluded Because It Is Based On Facts And Testimony Not In Existence And The *Ipse Dixit* Of Dr. Barnhart.**

Dr. Barnhart cited three things to support his opinion that dehydration is a plausible risk factor for Karen Hubbard's stroke, but there is no evidence to support one prong of his foundation and the other two are supported only by his "say-so."

Dr. Barnhart relies upon a belief that "it was noted in her medical records that somebody suspected it [dehydration].  I think it was the EMTs or the paramedics suspected or noted [dehydration]."  (Barnhart depo., p. 18; Barnhart report, p. 5).  However, the ambulance record says nothing at all about dehydration.  (Exhibit 1 – Douglas County EMS records).  The EMTs were not deposed and provided no statements or affidavits.  Neither does the Tanner Hospital medical record have any reference at all to dehydration.  (Exhibit 2 – Tanner Hospital records)

11

Second, Dr. Barnhart relies upon "her history of exercise and weight loss" as a basis for her dehydration. (Barnhart depo., p. 20, 24). Weight loss (and gain) and exercise are common occurrences for adults, and Dr. Barnhart does not offer any explanation why these common activities would cause Karen Hubbard's stroke. He simply says that they are plausible risks for her stroke. (Barnhart depo., p. 20, 24). This is an example of an expert's "opinion connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner,* 522 U.S. at 146.

Third, Dr. Barnhart relies upon a "mildly elevated" white blood count as being consistent with dehydration. Her other labs (sodium and potassium) were normal. (Barnhart depo., p. 27). Then, he testifies that "you can be clinically dehydrated and still have all normal lab tests." (Barnhart depo., p. 27). "I don't know what the cause of the white blood count is. Nobody is going to be able to know that. So the issue is does it fit into the story of plausibility? It does." (Barnhart depo., p. 29). It is difficult to understand from Dr. Barnhart what is the significance is of a mildly elevated white blood count, except that it means to him that she is dehydrated. But he also testified that a normal white blood count is not inconsistent with dehydration. Again, his opinion that the white blood count is related to Karen Hubbard's dehydration is connected only by the *ipse dixit* of Dr. Barnhart.

Dr. Barnhart's conclusion that Karen Hubbard is dehydrated is not based on a reliable foundation. Without addressing whether his conclusion is correct, this Court can and should exercise its authority under Rule 702 and *Daubert*, and exclude the opinion. There are gaps in the facts and data relied upon by Dr. Barnhart, and his opinion is the product of "assumptions and personal speculations", and therefore his opinion is based on "speculating and *ipse dixit* conclusions" and should be excluded. *Cunningham Charter Corp.,* at *5.

12

**III.     Dr. Crowther's Opinion About Dehydration Should Be Excluded Because It Is Based On Facts And Data Not In Evidence.**

Dr. Crowther's opinion that Karen Hubbard was dehydrated and that her dehydration was a risk factor for her stroke is based entirely on facts and data not in evidence.

First, Dr. Crowther testified repeatedly that he relied upon Mike Hubbard's testimony that Karen was dehydrated. (Crowther depo., p. 45, 51, 55). However, Mike Hubbard's testimony was unequivocal and to the contrary. "There was no way she was dehydrated." (M. Hubbard depo., p. 187)

Next, Dr. Crowther said he relied on Mike Hubbard's testimony that Karen was on a strict diet and failing to drink fluids. (Crowther depo., p. 45, 55). However, he admits that he is speculating about the diet except that it involved a caloric restriction. Dr. Crowther gives an unrelated example of a nurse who was on a strict diet and developed some unusual chemistry problem because she got sick of the diet and wasn't following it and became deficient in one of the vitamins. (Crowther depo., p. 55) Further, it was Mike Hubbard's testimony that he and Karen were drinking a minimum of 64 ounces of water every day. (M. Hubbard depo., p. 104). This amount does not even include things like coffee and tea with meals.

Third, Dr. Crowther points to "vigorous exercise" as a cause of dehydration. Mike Hubbard testified that six days a week, he and Karen walked the nature trails near their house, going about three miles per hour. (M. Hubbard depo., p. 106-7).

Finally, Dr. Crowther testified that dehydration leads to increased hematocrit (increased blood viscosity), thereby leading to clots. (Crowther report, p. 3). Karen Hubbard's hematocrit at Tanner Medical Center on October 30th, was normal. Dr. Crowther dismissed this normal reading by saying that she probably received IV fluids before the hematocrit lab was drawn. (Crowther

13

depo., p. 53-54).  However, Dr. Richard Warren, the Tanner emergency room physician who ordered the blood draw testified that the blood was drawn before she received any fluids.  (Warren depo., p. 75, 81-82)

The United States Supreme Court stated in *Kumho* that "where [an expert's] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question….the trial judge must determine whether this testimony has a reliable basis in the knowledge and experience of [the relevant] discipline." 526 U.S. at 149.  Dr. Crowther's testimony is factually unfounded and therefore, his opinion about dehydration is called into question, not because it is inaccurate, but because it is not based on sufficient facts and data.  "Expert opinion evidence based on assumptions not supported by the record should be excluded." *Tyger Const.* at 143.

It is within the Court's gatekeeping responsibility to consider whether the opinion have a reliable foundation and methodology, and if the Court finds that there are insufficient facts and data to reliably support an opinion, or that the facts and opinions are related only the by the say-so of the expert putting forth the evidence, the opinions should be excluded under Rule 702 and the case law cited above.

WHEREFORE THE ABOVE PREMISES CONSIDERED, Plaintiffs respectfully request that this Honorable Court exclude the opinion by Dr. Barnhart and Dr. Crowther about dehydration.

*s/ Leila H. Watson*
Leila H. Watson (ASB-3023-S74L)
D. Brett Turnbull (ASB-2569-D43T)
CORY WATSON, P.C.
2131 Magnolia Avenue S
Birmingham, AL 35205
Tel.: 205-328-2200
Fax: 205-324-7896
lwatson@corywatson.com
bturnbull@corywatson.com
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 15, 2018, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all attorneys of record.

s/Leila H. Watson